[No. 3392.]

## S. S. LEWIS *v.* THE STATE.

1. PRACTICE.— CHARGE OF THE COURT, in the absence of exceptions to its objectionable features, or special instructions seeking to correct it, will not be revised by this court unless there has been a material misdirection as to the law applicable to the case, or a failure to instruct the jury in the law demanded by the evidence; and further, unless such misdirection or omission is of such a character, in view of all the circumstances of the case, as may have injured the rights of the defendant.
2. MURDER OF THE SECOND DEGREE — FACT CASE.— See the statement of the case for evidence *held* sufficient to support a conviction for murder of the second degree.

APPEAL from the District Court of Live Oak.   Tried below before the Hon. D. P. Marr.

The appellant was indicted at the March term, 1885, of the district court of Live Oak county, for the murder of J. D. Edwards, in said county, on the 15th day of December, preceding. On trial he was found guilty of murder in the second degree, and his punishment was fixed at twenty years in the penitentiary.

Doctor G. P. Reagan was the first witness for the State. He testified that he knew the deceased during his life-time. The witness, in his capacity as a physician, was called to see the deceased on October 15, 1884, at his home in Live Oak county, Texas, and found him suffering intensely from a gun or pistol-shot wound. The ball struck the body of the deceased in the back, under the left arm, and passed out nearly in front of the breast-bone, barely missing the heart, and shattering a rib. Witness, as soon as called to attend the wounded man, attempted to probe the course of the wound, but desisted upon discovering that the operation was attended with pain too severe for the patient's endurance. The witness attended the deceased from the day of his injury, October 15, 1884, until he died, on December 3, 1884. Doctors Cooper, of Tilden, and Hayner, of Legarto, were also called to aid the witness. The wound described was the immediate cause of the death of Mr. Edwards. He was not a robust man, but his general health was good before he was shot. Witness's first treatment was to relax and quiet his nervous system at once, and to thoroughly cleanse the wound, which the witness did at intervals throughout his last sickness. The deceased was very weak when the witness reached him, which was some little time after he was shot, as the witness had to be summoned from and traverse a distance of some twenty miles. Witness, after cleansing the wound thoroughly, administered a feeble laxative to keep the bowels gently open, and a sedative to produce quiet; and, as soon as Edwards could be moved, witness had him brought from his ranch to Oakville, in order to attend him more effectively. On or about the twentieth day after the wound was inflicted, Doctor Cooper, in witness's presence, made an incision in the side of the wound, enlarging it so that accumulated corruption could escape. The accumulation of the corruption was very rapid. From the first to the last fever prevailed. Witness at no time was free of doubt that he and his associate physician could do the patient any permanent good.

L. M. Smith, of Bee county, was the next witness for the State. He testified that, en route to his home from San Antonio, whither he had taken some horses, in company with Willie Fox and Albert Wright, he reached the place of the deceased on October 15,

1884. Passing through the pasture of the deceased, and as he approached the gap or bars, he saw James Martin, driving his wagon, in which were his wife and the wife of his brother Mike Martin. James Martin had just driven his wagon through the bars, and was in the act of replacing the bars when he saw the witness approaching with his ambulance, when he stopped putting up the bars. Witness drove his ambulance through, and got out to aid Martin in replacing the bars. At or near this point the defendant's wire fence cornered with the wood fence inclosing the pasture of the deceased, the two fences running at right angles. Near the junction of these two fences, the witness saw the defendant and Winburn Williams, and approached them and engaged the defendant in conversation. At this time Martin's wagon containing the two ladies was standing a short distance east of the point where the witness and the defendant were standing, and witness's ambulance stood a little behind and to the left of the wagon. Some thirty or forty yards from the same point, and on the inside of his pasture, the defendant had his camp, wagon, etc. During the conversation between the defendant and witness, the defendant and Williams stood on the inside of the defendant's pasture, and witness and James Martin, a few feet apart, on the outside. Witness asked defendant how long it would be before he would see Rountree and Jim Moore. He replied that he had no idea when he would see Rountree, but that he expected to see Moore soon. Neither defendant nor Williams had arms on their persons at this time. At about this moment, Williams remarked : " Yonder comes some one now." James Martin remarked : " Yes, that is John Edwards and my brother Mike."

Deceased and Mike Martin, at that time, were about two hundred yards distant, on horseback, riding in an ordinary gait in a northerly direction along the wood fence. They were on the outside of Edwards's pasture fence. When James Martin remarked that the men approaching were Edwards and Mike Martin, the defendant and Williams turned, and without a word went to the defendant's wagon, standing in his pasture, got their guns and returned, with their guns, not exactly at their shoulders, but nearly at a present. Mike Martin, who was in advance of Edwards, rode rapidly. The deceased had his gun, but witness saw him make no demonstration with it until after he dismounted, which was after defendant and Williams had returned to the fence with their guns. Witness then saw the deceased, dismounted, at a point about one hundred and twenty or twenty-five yards from where witness and others were standing, with his gun in his hands, going along the wood fence, in

the direction of the defendant. Just before reaching his fence, on his return from his wagon, the defendant turned, and said to the deceased: "You d—d son-of-a-b—h, just make an attempt, and we will kill you." There was nothing in the way at this time to prevent the defendant from shooting the deceased, an open wire fence alone intervening between them. About this time Edwards reached the wood fence, and sighted his gun at defendant. He then mounted his wood fence and sighted his gun at Williams. He then got down from the fence into his own pasture, and advanced to a point about fifty or sixty yards distant, and fired at Williams. After the lapse of sufficient time for a man to take aim, Williams fired at the deceased. The deceased then started as though to recross his fence, but turned again and walked about three or four hundred yards along the wood fence, in an opposite direction from the defendant and Williams.

Witness heard defendant say to Williams, just after the latter fired at Edwards: "That's a d—d poor gun to go into a fight with — it snapped." After the deceased passed out of sight, the defendant and Mike Martin started off in the same direction. Witness interfered at this point, and told defendant that though a stranger in that section, he must call his attention to the fact that the deceased had gone off, and that he, the defendant, must go back. Defendant said in reply: "The d—d son-of-a-b—h, I could kill him, and I could whip him anyway if he would show himself." Defendant and Martin had at this time gotten from defendant's land on to that of Alsop, but went back into his own pasture almost immediately.

Leaving the defendant, the witness followed on in the direction taken by the deceased, and when he had traveled about four hundred yards, he found the deceased lying on the ground. He had apparently first sat down, and then to have leaned back on his elbows. He asked the witness to assist him home. Witness then brought his ambulance, and with others took the deceased to his house. Deceased was shot in the left side, the ball passing out at the breast, just in front of the breast-bone. The ball also passed through the left sleeve of his coat. When he arrived at home, deceased told witness that he was shot just as he went to turn to get over the fence where defendant was. His other remark was: "They have killed me, but I feel that I have done more than my duty. I want the law to take its course."

Mike Martin was the next witness for the State. He testified that for some time prior to October 15, 1884, he and his brother

James, with their wives, had been living at the house of the deceased. On that day they started on their journey east, the witness's brother driving a wagon containing the two ladies, and the witness on horseback. The deceased accompanied the witness on horseback, to ride around his pasture, and repair a break in his pasture fence. When the witness and the deceased reached a point about one hundred and fifty yards distant from the corner where the wire fence of the defendant joined the wood fence of the deceased, the witness saw the defendant and Williams leave the fence and go to the defendant's wagon, about forty yards distant, stoop down and pick up their guns. Witness then rode up to the defendant's fence, thinking that the deceased was still with him, until he had nearly reached the fence. When they got their guns, the defendant and Williams walked back to defendant's fence, with their guns presented towards the deceased, though not thrown up to their shoulders. Defendant about this time called to the deceased: "You d—d son-of-a-b—h, make a move, or an attempt, and we will kill you." Witness dismounted about twenty feet from the wire fence, secured his animal to a stake, and went up to the fence and spoke to the defendant, who was then on the inside of his own pasture, and asked him, in consideration of the presence of the ladies, to have no difficulty. Defendant then lowered his gun.

About the time that the defendant lowered his gun the witness heard some one cry out: "Look out; you will be shot." Witness looked up and saw Edwards in the act of getting through the fence. The deceased then kept up a dodging through the fence from one side to the other. On one side he would be in view of defendant; on the other side he would be in view of Williams. During all the time of this dodging, the deceased was getting further and further from defendant and Williams, and, when shot, he was further from the defendant and Williams than at first. Witness, having had his back towards deceased, did not know exactly when deceased dismounted. Nor did he know where the deceased first drew his gun, but saw that he had it when he was dodging through the fence. About the time that the witness heard some one warn some one else that he might get shot, he heard a shot fired from behind him, and in a few seconds another shot was fired. Defendant said, after the shooting, that his gun snapped, and he said it was "a d—d poor thing to go into a fight with, for it snapped." The deceased was inside of his own pasture when shot. After the second shot was fired he left, going along his own fence. The witness and the defendant started in the same direction, on the outside of the pasture

fence. They were intercepted by Mr. Smith, who told defendant to go back. Witness then asked defendant if he was going to the deceased to have a friendly talk with him. Defendant replied that he had no friendly talk for the deceased; but that he "could kill the d—d son-of-a-b—h, or whip him anyway." Defendant then turned and went back, and witness aided Smith to take deceased to his home.

James Martin was the next witness for the State. He testified that, in a wagon, accompanied by his wife and the wife of his brother Mike Martin, he left the deceased's house on the 15th day of October, 1884. He drove through the pasture of the deceased and passed out at the gap. When he was in the act of putting up the gap he observed the approach of Mr. Smith, Willie Fox and Mr. Wright. Smith and Fox were in an ambulance, and Mr. Wright was riding a horse. After Smith had passed through with his ambulance, he engaged defendant in conversation, the substance of which was as related by the witness Smith. Some one remarked about this time: "There comes some one now," and witness answered: "Yes, that is my brother Mike and John Edwards." Defendant and Williams then turned, without saying a word, went to the defendant's wagon, took up their guns, and returned to the fence with their guns at a present towards the deceased, but not braced against their shoulders. Witness asked the defendant not to precipitate a difficulty, as the deceased wanted none. Defendant replied: "I want some of it." Witness then remarked: "If you will fight, wait until I get my wife out of the way."

The defendant then walked up to the wire fence and met witness's brother Mike, who had ridden rapidly up, and entered into conversation with him. Witness joined Williams a few steps distant and attempted to prevent him from shooting. Edwards in the mean time had dismounted, and gone to his wood fence, and when he reached that fence Williams moved down below the intersection of the two fences, presented his gun, and said: "Let the d—d son-of-a-b—h show himself." Witness crossed the wood fence, got between Williams and deceased, and again attempted to prevent Williams from shooting. Williams, however, kept dodging about, trying to get a sight on deceased; and as soon as witness saw that he would be unable to keep down a fight, he stepped to one side, and immediately heard a shot from the direction of where deceased stood. Williams escaped this shot by bending nearly to the ground. He rose immediately and fired at Edwards. Edwards turned and walked off, and, as he was going, Williams threw another cartridge into his

Winchester rifle and took another aim at Edwards. Witness called to him not to shoot Edwards in the back. He raised the sight of his gun and remarked: "He can't get too far off for me." Witness interfered and prevented Williams from shooting again.

Wallace Fant testified, for the State, that in October, 1884, he lived within one and a half miles of Edwards, and about three miles from the house of the defendant. He knew, as a matter of fact, that, a dispute having arisen between deceased and defendant about the construction by the former of the wood fence spoken of by the witnesses in this case, bad feeling existed between them. Some time before this difficulty witness sent word to the defendant that he, defendant, had some cattle in his, witness's, pasture, and to come and get them. The nearest and most available point at which to turn cattle from the witness's into the defendant's pasture was at the point where the shooting occurred. The State closed.

William Fox was the first witness for the defendant. He testified that he was present at the shooting, having gone to the point with Smith and Wright. His account of the tragedy varies from that given by Smith and the two Martins only in the statement that, from the point where the deceased dismounted, he advanced from a distance of about one hundred and twenty-five yards from defendant and Williams, to a point distant from them only sixty or seventy yards, from which point he fired the first shot.

The testimony of Albert Wright, for the defense, was essentially the same as that of the witness Fox, the only variance being that this witness stated that when they got their guns from defendant's wagon and returned to the fence, the defendant and Williams had their guns braced against their shoulders and presented full at Edwards.

Mrs. Eliza Lewis, the wife of the defendant, was his next and last witness. She testified that prior to the shooting Fant sent word to the defendant that some of defendant's cattle were trespassing on Fant's pasture, and for defendant to come and remove them. The place of egress from that pasture was where the pastures of the deceased and the defendant joined, and where the fatal difficulty was said to have occurred. Defendant had no water except in a small well about a quarter of a mile from where the difficulty occurred. Deceased, by closing his fence, cut defendant's outside stock and the traveling public off from this water, and travelers were in the habit of breaking defendant's fence to get at the water, subjecting defendant to the danger of loss of stock. Defendant's purpose in going to the pasture that morning was to turn into his

pasture such of his stock as were outside, and to look after trespasses upon his fence. Defendant's wagon had been sent down into the pasture on the day before the killing, and the defendant went on foot to that point on the day before and .on the morning of the killing.

Williams, who was a hunter and an expert shot, had some horses in the defendant's pasture. He had come to defendant's house from a hunting expedition the day before the difficulty  Witness dispatched Williams to the gap on the morning of the difficulty, defendant having preceded him to that point. Williams took his Winchester gun with him,— his habit being to take his gun everywhere he went. Defendant, also, when he left home took his Winchester gun. Witness and defendant both knew, on the morning of the difficulty, that the injunction sued out against deceased had been dissolved. Defendant, at the time of the difficulty, was very feeble. He was ruptured, but at that time could not wear his truss. The wagon was used in transporting defendant from one point to another while in that condition. The defendant rode home horseback, after the shooting.

The motion for new trial complains:

1. That the verdict is contrary to the evidence.
2. That the verdict is excessive.
3. That the court erred in its charge to the jury.

*Walton, Hill & Walton,* for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

Willson, Judge. On the trial of this case in the court below, no exceptions were taken to the charge of the court to the jury, and no additional instructions were requested by the defendant. In this court, counsel for defendant, in an able brief, point out and discuss a number of supposed errors both of commission and omission in the charge of the court. Not even in the defendant's motion for a new trial were any of these supposed errors called to the attention of the trial court.

This being the attitude in which the charge of the court comes before us, we will not revise it, unless there has been a material misdirection as to the law applicable to the case, or a failure to instruct the jury in the law demanded by the evidence; and unless, further, such misdirection or omission is of such a character, in view of all the circumstances of the case, as, in our opinion, may have injured

the rights of the defendant. (*Elam* v. *The State*, 16 Texas Ct. App., 34.)

In the light thrown upon the charge by the able brief of counsel for the defendant, and in connection with the evidence, we have considered carefully, not only the objections urged by counsel, but the entire charge in all its parts. After scrutinizing and comparing it with the facts of the case, we have concluded that it contains substantially all the law of the case; that there has been no material misdirection as to the law, and no material omission to give the law. In our opinion there are some errors in the charge, which, if they had been excepted to at the trial, would have required a reversal of the conviction. These errors, however, in view of the evidence in the case, could not, in our opinion, have injured the rights of the defendant, and therefore do not demand that the conviction should be set aside.

As to the sufficiency of the evidence to support the verdict of the jury, we think there can be no question. We find no such error presented by the record as would warrant us in disturbing the judgment, and it is therefore affirmed.

*Affirmed.*

[Opinion delivered June 10, 1885.]